**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM J. MANSFIELD, INC.,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **UDREN LAW OFFICES, P.C.,** | : | **No. 18-03569** |
| *Defendants*. | : | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION OF THE COURT

PRATTER, J.                                                                    AUGUST 16, 2019

William J. Mansfield, Inc. provides legal advertising services to foreclosure law firms. Udren Law Offices, P.C. specialized in foreclosure law and procedures and recently wound up its practice. Over nearly 25 years, Mansfield regularly placed advertisements in various publications on behalf of Udren Law. Mansfield alleges that Udren Law owes Mansfield about $138,000 (plus interest) for these advertising services (invoices for which span the period from January 2018 to August 2018).

In turn, Udren Law claims that Mansfield employed deceptive billing practices. According to Udren Law, Mansfield's unclean hands prevent it from being paid for such services and instead entitle Udren Law to compensation by way of recovery for Mansfield's hidden "upcharges," which were allegedly included in Mansfield's invoices over the years. Udren Law estimates that its damages for the alleged up-charges are about $383,000.

The Court conducted a bench trial on April 2, 2019 and later heard oral argument on the parties' proposed findings of fact and conclusions of law. Upon consideration of these proceedings and based upon the evidence presented, the Court concludes, as set forth below, that (1) the record establishes the existence of an enforceable oral contract between Mansfield and Udren Law which

Udren Law breached, (2) because Mansfield and Udren Law entered into an enforceable oral contract, unjust enrichment is unavailable as a matter of law, (3) Udren Law is not entitled to any offset because of Mansfield's alleged failure to mitigate its damages, (4) Mansfield is entitled to pre-judgment interest, and (5) Udren Law did not carry its burden of establishing that Mansfield committed conversion by false pretenses.

## I.   Findings of Fact[1]

1.     Mark Udren formed the law firm Udren Law Offices, P.C. in April 1995.  April 2, 2019 Tr. at 138:22–24.  Mr. Udren was the law firm's sole shareholder from its inception to its winding down in 2018.  Id. at 138:16–18.  The law firm specialized in foreclosure work.  Id. at 139:4–18.  At its height, Udren Law employed between 250 and 350 people, including law professionals, paralegals, and clerical personnel.  Id. at 139:24–140:2.

2.     William J. Mansfield, Inc. is a legal advertising business that was founded in the 1930s.  Id. at 64:20–65:4. Currently, Mansfield has three employees.  Id. at 66:2–3.  The company's current president is Mark Mansfield.  Id. at 64:18–19.  Mark Mansfield began working at Mansfield in 1999.  Id. at 65:14–15.  His father, Jim Mansfield, was the previous president of Mansfield.  Id. at 130:3–6.

3.     One necessary component of the services Udren Law provided as a part of its foreclosure practice was to publish foreclosure notices in local periodicals, newspapers, journals, or the like, in each foreclosure case.  Id. at 23:15–24:4.  For more than 20 years, from 1995 until 2018, Udren Law used an outside vendor, Mansfield, to publish Pennsylvania foreclosure notices.

---

[1]     Because the parties did not order the final trial transcript, all citations are to the stenographer's "rough draft" of the transcript (hereinafter "April 2 Tr.").

Id. at 23:2–5, 25:20–22, 28:25–29:8, 145:12–14.[2]  Although the parties worked together for more than two decades, there was no written contract or written agreement between them, other than the invoices sent by Mansfield to Udren Law over the years.  Id. at 93:13–94:13.  In the four years preceding this litigation, from August 2014 until August 2018, Udren Law paid Mansfield just under $2 million for its advertising services.  Id. at 208:3–210:19.

4.      In general, Mansfield placed foreclosure notices on behalf of Udren Law in various publications then sent Udren Law an invoice.  Id. at 29:23–30:1.  Additionally, after placing a foreclosure notice, Mansfield sent to Udren Law "affidavits of publication," notarized and sworn affidavits stating that a particular foreclosure notice appeared in a particular publication on a given date.  Id. at 72:16–73:1.  Each invoice and affidavit of publication was sent by Mansfield to Udren Law using UPS overnight shipping,[3] except in circumstances where Udren Law required more immediate delivery (in which case Mark Mansfield testified that he would hand-deliver the affidavit).  Id. at 73:2–8.  Mansfield's invoices to Udren Law are the only written document "identifying what was being charged [by Mansfield] and for what purposes[.]"  Id. at 94:9–13.

5.      Every invoice from Mansfield to Udren Law contained line items for two types of charges: (1) a line item reading "Service Charge" and (2) a line item reading "Publications."  See Mansfield Exs. 5, 8–14,16–94.  On every at-issue invoice, the only amount for each "Service Charge" line item is $20.  Id.  The "Publications" line item amounts vary from invoice to invoice.  Id.  The "Publications" line item on each invoice lists the name of at least one periodical or newspaper and the charge for publishing a foreclosure notice in that periodical or newspaper.  Id.

---

[2]      Jim Mansfield was the president of Mansfield at the time the company started working with Udren Law.  April 2 Tr. at 130:3–6.

[3]      Mansfield paid for the UPS overnight shipping.  Id. at 73:9–10.

The "Publications" line item does not include any identifying information as to the costs for each "Publications" line item. Id.

6. Mr. Udren testified that Udren Law's understanding of the costs included in each line item was based on his "impression after the [first] conversation" between Udren Law and Mansfield. April 2, 2019 Tr. at 28:23–29:4. Mr. Udren's after-the-fact recollection of his firm's relationship with Mansfield was that Mansfield would place legal advertisements for Udren Law and that Mansfield would charge Udren Law the actual publication costs plus a $20 service "fee." Id. at 27:25–29:4. Mr. Udren's understanding was also shared by Lorraine Geist, Udren Law's former Vice President of Finances,[4] who testified that Mansfield charged Udren Law "$20 and what was listed as publication costs," i.e., "[t]he actual cost of the publication." Id. at 215:3–9.

7. In other words, Udren Law claims it understood (1) the "Service Charge" line item to represent a $20 fee charged by Mansfield and (2) the "Publications" line item to represent the actual costs incurred by Mansfield for placing a particular notice with a newspaper. Udren Law believed Mansfield's profits were derived entirely from the modest fixed "Service Charge," with no other profits or markup-above-costs included in Mansfield's invoices (including the "Publications" line item). Id. at 33:2–8, 52:8–22.

8. There were a number of key gaps in Mr. Udren's recollection about the arrangement between Mansfield and Udren Law, however. Mr. Udren testified that his memory may have been wrong at least in part, and the "Service Charge" line item billed by Mansfield may have originally been $5 when the parties first started working together, before increasing to $20

---

[4]     Ms. Geist began working at Udren Law in 2003, many years after the firm's relationship with Mansfield began. Id. at 192:1–5.

over time. Id. at 143:21–11.[5] He was not sure at all on this point. Furthermore, Mr. Udren testified

that he was not sure whether he was the one or whether it was his former co-worker at Udren Law

who negotiated with Mansfield originally, id. at 28:23–29:21,[6] and moreover, he was not sure who

represented Mansfield in those negotiations. Id. at 28:12–13, 29:9–10.[7]

9.      Mark Mansfield testified, on behalf of Mansfield, that Mansfield's actual pricing

structure was substantially different from Udren Law's understanding of it as explained by Mr.

Udren during the litigation.

10.     First, according to Mark Mansfield, Mansfield's "Publications" line item included

both a flat fee and a commission-based fee. Id. at 77:1–10. The flat fee represented a one-time

charge for publishing each notice, with the amount of the charge determined by whether the notice

was for a foreclosure ($90) or a sheriff's sale ($100). Id. at 77:5–7. The commission-based fee

changed from newspaper to newspaper and reflected the "gross" cost for a particular notice, as

quoted by a particular newspaper. Id. at 77:23–78:13. Mansfield would include the gross cost for

a notice in its invoices, even though it would often achieve discounts from some newspapers based

---

[5]     The parties do not dispute that the "Service Charge" line item on all of the at-issue invoices
was $20. Mark Mansfield testified, however, that over the course of the relationship between
Mansfield and Udren Law, Mansfield's "Service Charge" line item increased from $5 in the 1990s,
to $10 around the year 2000, to $13 around 2010, to $15 around 2013, and to $20 currently. April
2 Tr. at 81:10–16. Mark Mansfield's father, Jim Mansfield—the President of Mansfield at the
time the company started working with Udren Law—testified that when Mansfield and Udren Law
first began doing business together, Mansfield's "Service Charge" line item was $5. Id. at 130:3–
15.

[6]     When Mr. Udren founded Udren Law, he had only one employee, Tina Rich, who was
responsible for firm operations and eventually became Udren Law's COO. April 2 Tr. at 141:8–
19. Ms. Rich is deceased.

[7]     Indeed, during his deposition, Mr. Udren misidentified the party who negotiated on behalf
of Mansfield as "William Mansfield." Apr. 2 Tr. at 32:3–16. William Mansfield founded the
company in the 1930s. Id. at 64:20–25. Mr. Udren reasonably acknowledged that if William
Mansfield "passed away, then I spoke to someone else." Id. at 32:21–33:1.

on Mansfield's volume of overall business with that newspaper.  Id.  In other words, the "Publications" line item on each of Mansfield's invoices represented a combination of charges and exceeded Mansfield's actual costs associated with publication.  Id. at 77:11–16.

11.    Second, Mark Mansfield testified that each invoice also included a "Service Charge" line item that represented "an additional fee" of $20, which Mansfield would use to cover the "general cost of doing business," such as "correspondence, . . . the cost for the overnight [shipping of affidavits], it would include basic mailing costs, mailing the invoices back to the actual publications."  Id. at 80:23–81:6.  The "Service Charge" line item, therefore, was not a driver of Mansfield's profits, and instead accounted for various miscellaneous actual or typical overhead costs incurred during the publication process.

12.    Mansfield employed this pricing structure in its invoices to Udren Law as well as other law firms.  Id. at 131:24–132:3.  Some other law firms asked for and received a breakdown of Mansfield's prices in advance of Mansfield placing advertisements, but Udren Law never did so.  Id. at 81:23–82:15.

13.    Instead, Mark Mansfield testified that no one from Udren Law ever asked him about the pricing or components of Mansfield's service.  Id. at 80:15–18.  Udren Law never asked Mansfield for a "breakdown" of its charges or for an "explanation of the pricing."  Id. at 82:16–20. Jim Mansfield similarly testified that he did not recall a conversation that "he or someone else had" with anyone at Udren Law about Udren Law's alleged belief that the "Service Charge" line item was "the only charge" for Mansfield's services.  Id. at 130:19–131:1.  Finally, Mark Mansfield also testified that over the course of Mansfield's dealings with Udren Law, there was "no change in the methodology of the process of how Mansfield performed services for Udren Law[.]"  Id. at 93:9–12, 110:4–7.

14.     Despite what has now appeared to be the parties' very different understandings about Mansfield's pricing structure, they worked together cooperatively for "many years." Id. at 23:2–5, 25:20–22.  During this period, Mr. Udren confirmed that his approach was "if it ain't broke, don't fix it[.]" Id. at 25:23–25.[8]  Both Mr. Udren and Mark Mansfield testified that the companies never discussed Udren Law's supposed contrary reading of Mansfield's invoices, and no one from Udren Law ever sought clarification about Mansfield's invoices. Id. at 87:3–10, 47:4–14.

15.     In July 2018, Udren Law began to experience "financial difficulties," causing Mr. Udren to begin to contemplate closing the firm. Id. at 158:15–24, 197:11–18.  Mansfield received Udren Law's final request for services on July 17, 2018.  See Mansfield Ex. 102 (MANSFIELD0016).

16.     Because of Udren Law's struggles, the firm fell behind on paying Mansfield's invoices. April 2 Tr. at 29:23–30:11.  Although Mansfield ultimately received payments for some of the invoices it sent Udren Law in 2018, id. at123:24–124:2, it is undisputed that there are currently more than 80 invoices that remain unpaid. See id. at 87:24–89:7, 134:24–137:2; see also Mansfield Exs. 5, 8–14,16–94.  It is also undisputed that Mansfield actually placed the legal advertisements underlying the at-issue unpaid invoices, id. at 23:6–8, and that Udren Law itself was fully paid by its clients for the foreclosures (and notice services) that appeared in the advertisements Mansfield placed. Id. at 24:11–21, 62:25–63:3.

---

[8]     During the period between 1995 and 2018, Udren Law's business expanded, with the law firm opening offices and handling foreclosures in New Jersey and Florida; in both of these two states, Udren Law published foreclosures notices on its own behalf using its own personnel.  April 2 Tr. at 145:15–25.

17.     Udren Law conceded that its failure to pay Mansfield's invoices initially resulted from the law firm's insolvency and "not because of [any] alleged upcharge issue[.]" Id. at 27:14–19.  Udren Law claims it did not learn how Mansfield calculated the amounts charged in its invoices until around the time Mansfield commenced litigation against Udren Law.  Id. at 27:20–24.

18.     In August 2018, as Udren Law began winding down (and around the same time it stopped paying Mansfield), it transferred some of its clients to other law firms, id. at 50:17–25, including sending one of its major client portfolios, the Ocwen portfolio, to the firm RAS Citron. Id. at 49:7–50:8.  As part of the arrangement between Udren Law and RAS Citron, RAS Citron paid Udren Law $500,000 to allow Udren Law to stay open while it transitioned the files associated with the Ocwen portfolio to RAS Citron.  Id.  Although RAS Citron took control of the Ocwen portfolio, Udren Law "never transferred any of its accounts receivable to RAS Citron."  Id. at 48:1–6.  Udren Law used the $500,000 it received from RAS Citron to "pay its employees for work that they did in August 2018[.]"  Id. at 50:13–16.

19.     After RAS Citron began to work with several of Udren Law's former clients, Mark Mansfield communicated with an employee at RAS Citron to see whether the law firm would pay, voluntarily, Mansfield for 21 invoices-worth of work that Mansfield had already done on behalf of Udren Law.  Id. at 116:4–12.  To process Mansfield's invoices, RAS Citron required invoices not just from Mansfield but also the underlying invoices from the publishers with whom Mansfield worked.  Id. at 118:16–119:6, 223:17–226:5.[9]  When Mansfield was unable to provide the

---

[9]     The Court accepted Udren Law's offer of proof that Michelle Zelina would have testified on behalf of RAS Citron that "she had discussed and e-mail[ed] with Mr. Mansfield and in the course thereof he confirmed that his fee for Mansfield services was $20.  In addition she advised [RAS Citron] needed the actual publishers invoices to process the 21 invoices from Mansfield that [Mansfield] was requesting payment on[.]   [Mansfield] refused to turn [the publishers invoices]

publishers' invoices because the company "didn't even have" them, RAS Citron refused to pay the 21 invoices. Id. Although RAS Citron did not pay Mansfield for those 21 invoices, each of (1) counsel for Udren Law and (2) a representative of RAS Citron ultimately provided Mansfield with a few separate checks for work that Mansfield had previously done on behalf of Udren Law. Id. at 123:24–124:17. Counsel for the parties agreed that the invoices relating to those separate checks are not included in the invoices currently at-issue, and those checks do not reduce Mansfield's damages calculation. Id. at 135:3–23; see also Mansfield Exs. 5, 8–14,16–94.

20. The amount unpaid for the invoices at issue totals $138,241.08. See Mansfield Exs. 5, 8–14,16–94.[10]

## II. Conclusions of Law

As set forth below, the Court will enter judgment in favor of Mansfield. Mansfield brings two claims to recover for the balance of the unpaid invoices. Because the Court determines that Udren Law breached the oral agreement between the parties, it need only discuss the breach of contract claim (along with Mansfield's request for pre-judgment interest). In addition to opposing Mansfield's claims, Udren Law argues that any damages should be offset by Mansfield's failure to mitigate damages. The Court rejects this argument Udren Law also brings a counterclaim, alleging that Mansfield converted Udren Law's property by including hidden up-charges in its invoices. But Udren Law did not carry its burden to establish conversion.

---

over and then objected when [Mansfield] discovered that RAS Citron [tried to get the publishers invoices directly from the publisher]. " April 2. Tr. at 224:7–16, 226:2–5.

[10] During trial, counsel for Mansfield repeatedly stated that Mansfield is seeking $138,241.86. in damages. April 2, 2019 Tr. at 7:4–7, 89:9–19, 135:12–15. Udren Law stated that the amount unpaid by Udren Law is $130,060.14. Id. at 136:4–10. The Court has reviewed all of the outstanding invoices, i.e., Pltff. Exs. 5, 8–14,16–94, and calculated Mansfield's damages, before adding interest, to be $138,241.08. This is a 78¢ (seventy-eight cents) difference between the Court's calculation and Mansfield's calculation.

**A. Mansfield's Claim for Breach of Contract**

1.      Mansfield claims that Udren Law breached its oral contract with Mansfield by agreeing to use Mansfield to place legal advertisements but refusing to pay Mansfield after placement of some of those advertisements.

2.      "It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citation omitted). "[I]n determining whether an agreement is enforceable, [courts] must examine whether both parties have manifested an intent to be bound by the terms of the agreement, whether the terms are sufficiently definite, and whether consideration existed. If all three of these elements exist, the agreement shall be considered valid and binding." Johnston the Florist, Inc. v. TEDCO Constr. Corp., 657 A.2d 511, 516 (Pa. Super. 1995).

3.      "It is equally well established that an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted. In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." Prieto Corp. v. Gambone Const. Co., 100 A.3d 602, 609 (Pa. Super 2014) (citation omitted). Courts must, therefore, "look to the parties' course of conduct to ascertain the presence of a contract." Id.; see also Boyle v. Steiman, 631 A.2d 1025, 1033 (Pa. Super. 1993) (stating same) (citing Westinghouse Electric Co. v. Murphy, Inc., 228 A.2d 656, 659 (Pa. 1967)); Moore Eye Care, P.C. v. ChartCare Sols. Inc., 364 F. Supp. 3d 426, 432 (E.D. Pa. 2019) ("[T]he parties' course of performance is relevant to show a waiver

or modification of any term inconsistent with the course of performance.") (citation and quotation omitted).

4.    "The burden is on the plaintiff to prove by a preponderance of the evidence the existence of the contract to which the defendant is a party." <u>Viso v. Werner</u>, 369 A.2d 1185, 1187 (Pa. 1977).

5.    Here, the parties both presented evidence showing that Udren Law and Mansfield orally agreed that Mansfield would provide Udren Law advertising services.  Findings of Fact, ¶ 3.  The only question is how much the parties agreed Udren Law would pay Mansfield for its advertising services.  Because the "precise content" of Mansfield and Udren Law's agreement is "not of record," the Court "must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." <u>Prieto Corp.</u>, 100 A.3d at 609.

6.    As a threshold matter, the Court cannot rely only on the parties' testimony to determine the "precise content" of the fee structure agreed to by Mansfield and Udren Law because the parties have fundamentally conflicting recollections of their agreement (at least according to their testimony in this litigation), neither of which is alone persuasive.   Specifically, the parties disagree whether the "Publications" line item on each invoice should have included only the <u>actual</u> costs of publication—Udren Law's theory, Findings of Fact, ¶¶ 6–7—or whether the "Publications" line item also could have included some markup above costs—Mansfield's theory. Findings of Fact, ¶¶ 10–11.

7.    The viability of Udren Law's understanding of the terms is seriously undercut by inconsistencies in Mr. Udren's testimony, including his inability to remember specific price points and his inability to remember who negotiated on behalf of either party.  Findings of Fact, ¶ 8.

8. Although the Court cannot credit Udren Law's theory and has significant concerns about Mr. Udren's credibility, there are also issues with Jim and Mark Mansfield's testimony. Mansfield did not present any contemporaneous evidence showing that Udren Law intentionally agreed to pay a "Publications" line item above its costs. Indeed, neither of Mansfield's witnesses—Jim and Mark Mansfield—affirmatively testified at all about the original agreement between Udren Law and Mansfield. Instead, both men merely testified that they had never had a conversation with anyone at Udren Law about Udren Law's understanding of Mansfield's charges. Findings of Fact, ¶ 13. And though Mark Mansfield also testified about how Mansfield calculated the "Publications" line item in practice, that testimony has no bearing on any earlier meeting of the minds between Mansfield and Udren Law prior to performance, particularly when considering that Mark Mansfield did not start working at Mansfield until years after Udren Law and Mansfield started working together. Findings of Fact, ¶ 2.

9. Nonetheless, the parties' course of performance after their initial agreement in 1995 strongly supports Mansfield's interpretation.

10. A defendant's "payment of some of the instant invoices" is a course of performance "evidencing acceptance" of the invoice's terms. Prieto, 100 A.3d at 610. Here, Udren Law did not just pay "some" of Mansfield' invoices. For more than 20 years Udren Law paid all of Mansfield's invoices in full and without objection as presented (*i.e.*, in the same form as the invoices now after all these years presented and in dispute), adopting the mantra "if it ain't broke, don't fix it." Findings of Fact, ¶¶ 3, 14. What was not "broke" was a practice that directly contradicts Udren Law's purported understanding of the agreement.

11. The Court recognizes that the costs incumbent in the "Publications" line item were not expressly identified on the face of any of the invoices. Nonetheless, Udren Law never

suggested to Mansfield that the "Publications" line item was too expensive, insufficiently explained, or ambiguous, Findings of Fact, ¶ 13, and so it accepted the implicit costs incorporated in the invoice. A hypothetical is illustrative. Imagine that a restaurant customer visiting Philadelphia orders a cheesesteak "whiz wit" but does not inquire what "whiz wit" means. Eminently (and predictably) satisfied, the customer returns to the restaurant every night of her stay in town, again ordering a cheesesteak "whiz wit." On the seventh night, however, when the customer asks the restauranteur (or a cheese aficionado perhaps) what comes on a "whiz wit" cheesesteak, she is appalled to learn that the cheese on her cheesesteak was literally Cheese-Whiz (and not a recognized gourmet cheese) and demands a refund for all seven steaks. The customer's consternation aside, her course of performance resoundingly demonstrates that she accepted the eatery's terms of sale.

12. Furthermore, Udren Law's sophistication and its experience in the foreclosure industry makes it even more responsible than the hypothetical gourmand. As Mr. Udren testified, Udren Law was certainly very familiar with publication costs of foreclosure notices because it internally arranged for the publication of many notices related to properties in New Jersey and Florida. Findings of Fact, ¶ 14 n.8. Consequently, Udren Law had extensive market information and capabilities that could have allowed it to determine easily that Mansfield's "Publications" line item exceeded costs, or, at minimum, to ask questions about Mansfield's "Publications" line item calculations.

13. For more than 20 years, Mansfield billed for—and Udren Law paid—charges in excess of Mansfield's publication costs. As Mr. Udren testified, until it became insolvent, Udren Law "paid Mansfield Advertising for its services without objection for many years[.]" Findings of Fact, ¶ 14; see also April 2 Tr. at 25:20–22. Indeed, in the four years before this lawsuit, Udren

Law paid Mansfield nearly $2 million for Mansfield's services.  Findings of Fact, ¶ 3.  And when Udren Law began to experience serious financial reverses, at least initially, the decision not to pay had nothing to do with Mansfield's billing practices at all.  Findings of Fact, ¶ 17.

14.     Udren Law's course of performance allows only one conclusion:  Udren Law accepted Mansfield's method for calculating and billing for the "Publications" line item.  In <u>Prieto</u>, the parties' "extensive course of dealing for almost a decade before nonpayment began" provided sufficient evidence for the court to affirm judgment in favor of the plaintiff.  100 A.3d at 610. Here, in terms of the length of time (not to mention the frequency), Udren Law's history of full payment is twice as "extensive," as it spanned more than 20 years.  Udren Law's course of performance, therefore, shows persuasively that it accepted Mansfield's terms.

15.     Udren Law next argues that there are two reasons why an agreement between Udren Law and Mansfield is unenforceable.  First, Udren Law argues that the costs included in the "Publications" line item were contrary to Udren Law's reasonable expectations.  Second, Udren Law argues that it is excused from paying Mansfield's calculated "Publications" line item by unilateral mistake doctrine.  The Court rejects both arguments.

   i.   <u>Udren Law's "Reasonable Expectations" Do Not Excuse Its Course of<br>Performance</u>

16.      Relying primarily on the Restatement of Contracts (as well as an unpublished opinion from this District),[11] Udren Law argues that the fees included in the "Publications" line item were varyingly "unconscionable," outside the parties' "circle of assent," and "beyond the range of reasonable expectations."  Udren Law's Proposed Findings of Fact and Conclusions of

---

[11]     See <u>Ryan v. Delbert Servs. Corp.</u>, No. 15-05044, 2016 WL 4702352, at *5 (E.D. Pa. Sept. 8, 2016).

Law, ¶¶ 134, 141.[12]  These arguments boil down to Udren Law asserting that Mansfield "should have known" that Udren Law would never had agreed to pay a "Publications" line item including fees above Mansfield's basic costs.  Why Mansfield "should have known" this is, in Udren Law's final analysis, unexplained.

17.     The Restatement (Second) of Contracts, § 211(3), states that where "the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement."  Comment f adds that "a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term."

18.     According to Udren Law, it "can be and should be inferred from the circumstances that Mansfield knew its clients, including Udren Law, were ignorant of any upcharges within the line item 'Publications' charge."  Udren Law's Proposed Findings of Fact and Conclusions of Law, ¶ 140.  Udren Law bases this assertion on three things: (1) that Mansfield never proactively told Udren Law about its pricing structure, (2) that Mansfield later refused to give certain financial documents to an unrelated third party, the law firm RAS Citron, and (3) that Mansfield produced a "chart" during discovery that "understates how much publishers actually charged" Mansfield.  See id.  None of these three assertions show how Mansfield had or should have had actual or

---

[12]     To the extent that Udren Law relies on unconscionability doctrine, that reliance is misplaced.  A contract is only unconscionable if "there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it."  Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007) (citation omitted).  Here, Udren Law, a sophisticated party, has pointed to nothing by which it procedurally or substantively lacked a meaningful choice.  See id. (the burden of proof rests on "the party challenging the agreement[.]") (citation omitted).

constructive notice that Udren Law would have rejected the charges included in the "Publications" line item.

19. First, and most significantly, the facts show that Udren Law never objected to—but actually tacitly accepted—Mansfield's pricing structure, even though Udren Law easily could have found out about the structure if it had made any effort to do so. Udren Law ignores the fact that, during the entire time Udren Law and Mansfield did business together, Udren Law never asked Mansfield how it calculated the "Publications" line item and, as described above, it paid the invoices for "many years." Findings of Fact, ¶ 13. Udren Law's continual payment of Mansfield's invoices strongly demonstrates that Udren Law did not need or want any additional information from Mansfield and that Udren Law accepted Mansfield's "Publications" line item as reasonable. See supra Conclusions of Law, ¶ 10–13.

20. Moreover, to the extent that either party was on constructive notice of the other's contract interpretation, Udren Law should have been aware that Mansfield was including costs above publication fees in the "Publications" line item. As Mr. Udren testified, over the years Udren Law was itself responsible for arranging for the publication of many foreclosure notices related to properties in New Jersey and Florida. Findings of Fact, ¶ 14 n.18; see supra Conclusions of Law, ¶ 12. Udren Law should have known the typical or prevailing costs for publication of foreclosure notices, and should have (or could have) realized that Mansfield was in fact charging Udren Law an amount that exceeded costs alone.

21. Second, Mansfield's later interactions with RAS Citron, who had no agency or other relationship with Udren Law and is a third party outside the scope of this action, have no bearing on Udren Law's subjective interpretation of its agreement with Mansfield. They also

certainly have no bearing on what Mansfield knew or did not know of Udren Law's interpretation of the invoices.

22.     Third and finally, the Court does not accept Udren Law's self-serving characterization of a "chart" produced in discovery. And, because Udren Law does not even state whether the chart was admitted or is admissible as evidence—let alone cite to an exhibit number or otherwise identify what particular chart Udren Law is referencing—the Court is unable to draw the conclusions urged by Udren Law.

ii.   Udren Law Is Not Entitled to Invoke Unliteral Mistake Doctrine

23.     Udren Law separately argues that unilateral mistake doctrine should excuse its breach of contract. The unilateral mistake doctrine applies "if the non-mistaken party knows or has reason to know of the unilateral mistake, and the mistake, as well as the actual intent of the parties, is clearly shown[.]" RegScan, Inc. v. Con-Way Transp. Servs., Inc., 875 A.2d 332, 340 (Pa. Super. 2005).

24.     But, as described above, see supra Conclusions of Law, ¶¶ 10–14, Udren Law's actions were not sufficient to place Mansfield on actual or constructive notice of Udren Law's purported mistake.

25.     Therefore, the Court determines that Mansfield has established, well beyond a preponderance of evidence, that (1) there was an agreement between Mansfield and Udren Law and Udren Law's course of performance evidences that the agreement included the fees baked into Mansfield's "Publications" line item, (2) Udren Law breached that agreement, and (3) Udren Law suffered damages, in the amount of $138,241.08 for the unpaid invoices. See Mansfield Exs. 5, 8–14,16–94.[13]

---

[13]     In addition to its claim for breach of contract, Mansfield brought a claim for unjust enrichment as an alternative basis for recovery. "The elements of unjust enrichment are benefits

**B. Mansfield's Request for Interest**

26.    In addition to the amount owed for the outstanding invoices, Mansfield asks an award of pre-judgment interest.

27.    "If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows . . . . Where the defendant commits a breach of a contract to pay a definite sum of money." Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988) (adopting Restatement (Second) of Contracts § 354). This provision is applicable here. The statutory legal rate in Pennsylvania is 6%. See TruServ Corp. v. Morgan's Tool & Supply Co., Inc., 39 A.3d 253, 261, 265 (Pa. 2012).

28.    Mansfield is entitled to 6% interest on the balance from each of the unpaid invoices. As of August 9, 2019, Mansfield is entitled to a total of $10,897.50 in interest.[14]

**C. Udren Law's Mitigation Argument**

29.    Udren Law argues that in the event the Court determines that Udren Law breached its contract with Mansfield, the Court should offset Mansfield's damages by $50,026.30 because

---

conferred on one party by the other party, appreciation of such benefits by one party, and acceptance and retention of such benefits under such circumstances that it would be inequitable for one party to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, [courts] focus not on the intention of the parties, but rather on whether the one party has been unjustly enriched." McConaghy v. Bank of New York for Certificate Holders CWALT, Inc., Alternative Loan Tr. 2006-45T1, Mortg. Pass-Through Certificates, Series 2006-45T1, 192 A.3d 1171, 1175 (Pa. Super. 2018) (citation omitted). Courts "may not make a finding of unjust enrichment . . . where a written or express contract between parties exists." Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999) (citation omitted). Here, the Court already concluded that an express oral contract existed between Mansfield and Udren Law, making the unjust enrichment doctrine inapplicable

[14]    Mansfield submitted to the Court, with the consent of counsel for Udren Law, a spreadsheet designed to make easier the Court's calculation of the interest owed on each outstanding invoice balance. Although the Court appreciates Mansfield's consideration (and finds no fault with Mansfield's effort), the Court engaged in its own calculations to determine the appropriate amount of pre-judgment interest.

Mansfield failed to mitigate its damages. According to Udren Law, third-party law firm RAS Citron "reached out to Mansfield advertising in connection with 21 files/invoices transferred from Udren Law which are among the 86 files/invoices identified in Mansfield's Complaint, and expressly requested that Mansfield provide copies of the publisher invoices/receipts so that it could review the publisher invoices and submit the 21 files/invoices to its client, Ocwen, for payment." Udren Law's Proposed Findings of Fact and Conclusions of Law, ¶ 166.[15] Because of this outreach, according to Udren Law, Mansfield was obligated to comply with RAS Citron's terms to mitigate the damages that Udren Law caused Mansfield.

30.     "Mitigation is an affirmative defense, for which the breaching party bears the burden of proof. To prove a failure to mitigate, one must show: (1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced. Damages that could have been avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered as not being chargeable against the defendant. Reasonableness is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." Prusky v. ReliaStar Life Ins. Co., 532 F.3d 252, 258–59 (3d Cir. 2008) (citations and quotations omitted); see also Ecksel v. Orleans Const. Co., 519 A.2d 1021, 1028 (Pa. Super. 1987) ("A party who suffers a loss has a duty to make a reasonable attempt to mitigate damages, but the burden is on the party who breaches the contract to show how further

---

[15]     As Udren Law impliedly recognizes in a footnote, its Answer and Counterclaim do not include a mitigation defense. See Udren Law's Proposed Findings of Fact and Conclusions of Law, fn. 6; see also Doc. No. 23 (Udren Law's Answer to Complaint, Affirmative Defenses, and Counterclaim). Udren Law requests that the Court grant it leave to conform its pleadings to the evidence resented at trial, under Federal Rule of Civil Procedure 15(b). The Court grants Udren Law's request for leave, but, as set forth in this section, concludes that Udren Law did not establish the evidence necessary to succeed on its mitigation defense.

loss could have been avoided through the reasonable efforts of the injured party.") (citation omitted).

31.    Udren Law's argument fails for the simple reason that it has not submitted sufficient evidence to carry its burden.

32.    The record establishes that RAS Citron refused to reimburse Mansfield unless Mansfield provided RAS Citron with invoices provided to Mansfield by the publishers Mansfield used.  Findings of Fact, ¶ 19.[16]  But the record does not show that Mansfield's failure to provide the publishers' invoices was unreasonable because, as Mark Mansfield testified, Mansfield "didn't even have" the publishers' invoices to provide to RAS Citron.  Id.  Udren Law did not submit any further evidence establishing (1) that Mansfield could easily have acquired the publishers' invoices, or (2) that Mansfield's inability to reach an alternative arrangement with RAS Citron was unreasonable.

33.    Udren Law did not carry its burden to establish a mitigation defense.

## D.  Udren Law's Counterclaim for Conversion

34.    In addition to opposing Mansfield's claims, Udren Law brought its own claim against Mansfield on the basis of conversion by false pretenses.

35.    Conversion is the "deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification."  Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695, 704

---

[16]    In its proposed findings of fact and conclusions of law, Udren Law cites repeatedly to Udren Law Exhibit 3—a series of emails purportedly between RAS Citron and Mark Mansfield.  See Udren Law's Proposed Findings of Fact and Conclusions of Law, ¶¶ 50, 53–56, 59, 60, 82, 169, 171,  At trial, however, Mansfield successfully objected to admission of the emails contained in Udren Law Exhibit 3 as hearsay.  See April 2 Tr. at 226:8–229:12.  Thus, the emails that Udren Law hopes to use for this argument are not part of the record.

(3d Cir. 1995) (quotation and citation omitted); see also Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. 2003) ("Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification.") (citation omitted).

36.     According to Udren Law, Mansfield was not entitled to all of the fees it charged Udren Law in excess of its actual publication costs. This is because Mansfield allegedly "create[d] a contrived and misleading understanding" of the terms of its agreement with Udren Law by "identifying the charges in a deceptive manner, expressly stating that the publications charge represented the actual publication costs, expressly stating that the 'Service Charge' was the charge for its services, and refusing to disclose documents which would have revealed the deception." Udren Law's Proposed Findings of Fact and Conclusions of Law, ¶ 177.

37.     These arguments largely cover again territory the Court has already traversed. The record does not support Udren Law's argument that Mansfield misled Udren Law. Indeed, Udren Law's self-proclaimed "if it ain't broke don't fix it" philosophy supports the exact opposite, showing that Udren Law was satisfied with Mansfield until it needed a reason to be dissatisfied as a way of dealing with its financial troubles. See Findings of Fact, ¶ 14.

38.     Likewise, Udren Law has not carried its burden of establishing, by a preponderance of the evidence, that Mansfield took possession of Udren Law's property without Udren Law's consent. Even if Mansfield's invoices were ambiguous insofar as they did not explicitly state what charges were included within the "Publications" line item, Udren Law's decades-long course of performance—whereby it requested that Mansfield place legal advertisements and then paid Mansfield for each placement—strongly rebuts any argument that Mansfield was not entitled to the payments or that Udren Law did not consent. Findings of Fact, ¶¶ 3, 14. Furthermore, there

is no reliable testimony in the record establishing that Mansfield expressly stated that the "Publications" line item represented only Mansfield's actual publication costs or that the "Service Charge" line item represented Mansfield's only fee. Findings of Fact, ¶ 8. Finally, as stated above, Mansfield's dealings with RAS Citron do not offer any insight into Udren Law's own understanding of its agreement with Mansfield.

39.     Because Udren Law cannot establish by a preponderance of the evidence that Mansfield was not entitled to the payments included in the unpaid invoices, the conversion claim fails as a matter of law.

## III.    Conclusion

For the reasons set out above, the Court concludes that Udren Law breached its oral agreement to pay Mansfield for the provision of advertising services. Further, Udren Law is not entitled to a mitigation defense. Mansfield is awarded $138,241.08, plus $10,897.50 pre-judgment interest.

The Court also concludes that Udren Law did not carry its burden of establishing that Mansfield engaged in conversion.

Accordingly, the Court will enter judgment in favor of William J. Mansfield, Inc. and against Udren Law Offices, P.C., in the aggregate amount of $149,138.58.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE